## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JASMINE NOBLE,

     *Plaintiff,*

*v.*                          CASE NO. 14-12588

CAROLYN W. COLVIN        DISTRICT JUDGE GEORGE CARAM STEEH
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

      In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, that Defendant's Motion for Summary Judgment **DENIED**, and that the case be remanded to the Commissioner for further proceedings under sentence four of 42 U.S.C. § 405(g).

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/ JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

II.   **REPORT**

A.   **Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* The matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 15.)

Plaintiff Jasmine Noble was twenty-four years old when she applied for benefits on October 14, 2011, alleging that she became disabled on January 1, 1997. (Transcript, Doc. 10 at 134.) At the initial administrative stage, the Commissioner considered whether she was disabled due to affective disorders and intellectual disability.[2] (Tr. at 77.) None of the impairments, alone or combined with others, was found to be disabling. (*Id.*) Plaintiff asked for a hearing in front of an Administrative Law Judge ("ALJ"), who would consider the application de novo. (Tr. at 82-85.)

ALJ Tammy Thames convened the hearing on November 28, 2012. (Tr. at 34-64.) In her decision issued on February 15, 2013, the ALJ found that Plaintiff was not disabled. (Tr. at 11-23.) The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on May 9,

---

[2] Cognizant of the negative connotations attached to the term "mental retardation" and in light of federal legislation in related areas, in 2013 the Commissioner replaced the term "mental retardation" with "intellectual disability" in the regulation at issue here. *Change in Terminology: "Mental Retardation" to "Intellectual Disability"*, 78 Fed. Reg. 46,499 (Aug. 1, 2013) (codified at 20 C.F.R. pt. 404, subpt P, app. 1). The change in terminology did not reflect any substantive change. *Id.* at 46,500-01; *see also Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 982 n.2 (11th Cir. 2013). Where possible, this Report follows the new terminology.

2014, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On July 7, 2014, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

**B.    Standard of Review**

Applicants for Social Security benefits go through a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v.*

4

2:14-cv-12588-GCS-PTM   Doc # 18   Filed 05/21/15   Pg 4 of 50   Pg ID 722

*Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v.*

6

*Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.      Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-85. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at

8

540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D.    ALJ Findings

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the application date. (Tr. at 13.) At step two, the ALJ concluded Plaintiff had the following severe impairments: "depressive disorder not otherwise specified (NOS), learning disorder NOS, mild mental retardation, and bipolar disorder." (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (*Id.* at 13-16.) The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of work at all exertional levels. (Tr. at 17-21.) No step-four analysis was necessary, as Plaintiff had no past relevant work. (Tr. at 21.) Finally, at the last step, the ALJ found that a significant number of jobs existed suitable to Plaintiff's limitations. (Tr. 22.)

## E.    Administrative Record

## 1.    Medical Evidence

School records from the fall of 1997, when Plaintiff was in the fifth grade, indicate she was placed in an individualized educational program due to her learning disability.

9

(Tr. at 219.) Her behavior frequently disrupted the classroom, but the instructors could not determine "whether [the] child's difficulty is centered around academics since she also is have difficulty at home w[ith] siblings." (Tr. at 221.) Yet her reading comprehension, vocabulary, and ability to answer questions were flagged as problematic. (Tr. at 222.) The team report recommending this course of action noted many pertinent findings. (Tr. at 225.) First, there were no "[e]ducationally relevant medical findings" made during the investigation. (*Id.*) Reading comprehension was the only learning area in which she displayed a "severe discrepancy between achievement and ability," and this discrepancy did not "primarily" result from "mental retardation" or "emotional disturbance." (*Id.*) Rather, it arose from "[t]he effects of environmental, cultural and economic differences," which constituted "the primary cause of the student's problem." (*Id.*) In conclusion, she was "eligible" for the program because she had a "[s]pecific [l]earning [d]isability." (*Id.*)

The findings included a "[p]sychoeducational" report completed by Dr. Michaele Jaime, Ed.D., the school psychologist. (Tr. at 227.) At the end of the previous school year, Plaintiff's teacher referred her for the program due to her "poor academic progress in the areas of written expression and mathematics." (Tr. at 227, 237, 239-42.) Her siblings had not experienced similar problems, according to her mother, and though shy, Plaintiff generally "gets along well" with friends until "she doesn't get her way," at which point she displayed her anger in unhealthy manners. (*Id.*) Her attendance was poor over the previous year, the teacher reported. (Tr. at 227, 236.) During testing with Dr.

10

Jaime she was cooperative and friendly, but not spontaneous; she demonstrated poor attention and problem solving skills; and frequently she failed to "respond at all." (Tr. at 229.) Observing her in the classroom, Dr. Jaime noted that while she did not disrupt the class, she did not participate and often needed assistance from the teacher or peers to complete tasks. (*Id.*)

On the Wechsler Intelligence Scale, Plaintiff scored an 84 on verbal, 54 on performance, and earned a full scale score of 67. (Tr. at 230.) These scores "fell within the borderline range" of cognitive functioning. (Tr. at 231.) Plaintiff's fourth grade teacher offered various observations implicating her affective and adaptive performance: Plaintiff was erratic, did not "mix well," avoided others, displayed frequent mood changes, did not finish tasks, and reluctantly answered questions. (Tr. at 232, 240.) Overall, Dr. Jaime recommended that Plaintiff enter the special education program. (Tr. at 233.)

The school staff reviewed Plaintiff's progress in the second half of the year, deciding not to hold her back from the sixth grade. (Tr. at 245.) She was relating well with her peers, respectful to teachers, and willing to learn, and accordingly the staff felt that "no behavioral intervention plan is necessary." (Tr. at 245-46.) Nonetheless, they concluded that both the general academic classes and the special education classes were "too demanding," and instead she would "be in the special education setting—the general curriculum will be followed at [her] level of functioning." (Tr. at 246.) The report notes that despite making progress, Plaintiff continued to struggle in reading comprehension

11

and maintaining appropriate behavior, particularly in checking her temper. (Tr. at 249-51.)

The next report comes from Plaintiff's seventh-grade year, in the fall of 1999. (Tr. at 254.) Absences and tardiness were continuing issues. (*Id.*) She still needed special education classes, but only part time, and she participated in the same "activities and non-elective classes as regular education students." (Tr. at 255.) Her teachers noted that she was completing work, or at least attempting to, and was failing in one class while earning two B's and a C in the others. (Tr. at 259.) She wrote at the fourth-grade level and struggled with reading comprehension. (Tr. at 260, 262.) In mathematics, she could add and subtract but had difficulty multiplying and dividing. (Tr. at 263.) Targeted improvements included prompt attendance, completion of all school work, and cooperation with adults. (Tr. at 264.)

Plaintiff stayed in the program during her eighth-grade year, as full-time participation in the regular educational program was still "too demanding" and the "full-time" special education program "too restrictive." (Tr. at 267-68.) She spent four periods per day in the individualized special program and the other two periods in the general education program. (*Id.*) Transition planning for graduation was also considered, and the school placed her in the "Regular Diploma Program" rather than the "Special Education Alternate Strategy Program." (Tr. at 270.) Behavioral improvements remained necessary, particularly in completing tasks. (Tr. at 271.) Her written work remained substandard. (Tr. at 272.) At the annual review in the spring of 2000 the school recommended she

12

remain in the special education program part-time, at the same level as before. (Tr. at 277.) However, her behavioral issues were such that, while improving, she still failed to turn in work and still had attendance issues; consequently the social worker recommended continuing services for Plaintiff. (Tr. at 279, 281.) In mathematics, she tested at the third-grade level. (Tr. at 280.)

A team report in September 2000 provided an extensive reevaluation of Plaintiff's learning disability. (Tr. at 285.) It again noted the "severe discrepancy between [her] achievement and [her] intellectual ability" in both written expression and mathematics. (*Id.*) And again it found that "mental retardation" and emotional disturbance were not the primary causes of this discrepancy; unlike before, however, the team also rejected "environmental, cultural or economic differences" as the "primary cause of the student's problem." (*Id.*)

For the report, a school psychologist, Dr. T. Michael Knack, Ph.D., examined and tested Plaintiff. (Tr. at 287.) He noted that her grades had improved during seventh grade, beginning with C's, D's, and E's, but ending with one A, five C's, and one E. (*Id.*) She related "adequately with her teachers" and "'o.k. with the other students." (*Id.*) Her teachers noted that she appeared withdrawn in class, not answering oral questions and struggling to understand written questions. (*Id.*) They also reported that she remained quiet, had "fair" relationships with her peers, and needed close monitoring. (Tr. at 289, 293-95.)

On the Weschler Intelligence Scale she scored 89 in verbal and 79 in performance, for a full scale score of 83. (Tr. at 288.) Analyzing the test, Dr. Knack observed that the verbal skills were in the "low average range," the non-verbal skills were in the "borderline range," and the overall skills were in the "low average range." (*Id.*) He believed that her previous test, with much lower scores in performance and full scale, "was probably a very low estimate of her Performance abilities." (Tr. at 289.) Her reading skills had progressed and now registered at the 4.4 to 5.5 grade level, her mathematical skills were at the 4.7 to 6.3 grade level, her written expression scores ranged from the 3.3 to the 5.6 grade level, and her psychomotor development was in the borderline range. (*Id.*) Dr. Knack recommended she continue in the program with possible modifications if she demonstrated more ability to "work independently, complete her work, and turn in her assignments." (Tr. at 289-90.)

In 2002, while in the ninth grade, Plaintiff had a child and later returned to school. (Tr. at 433.) At the time, she lived with her siblings and her mother, who "helps a lot with the baby especially when she is in school." (*Id.*) The father also participated in childcare. (Tr. at 438.) Her goals were to attend college and become a registered nurse. (Tr. at 433.) In January 2004, she told her doctor that she was in the tenth grade. (Tr. at 451.) Later that year, in April 2004, she reported that she was taking GED classes and "doing well." (Tr. at 431.)

The next report in the record comes from a consultative examination with Dr. Mark Zaroff, Ph.D., in 2005, apparently related to a prior application for disability

14

benefits.[3] Asked why she sought benefits, she replied, "I have a temper and stuff like that," and "[p]eople aggravate me." (Tr. at 300.) She explained her history of learning problems, particularly with mathematics, but "denied any functional deficits and stated she is able to count money and use math in daily life adequately." (*Id.*) In school her typical grades were C's, and she dropped out after becoming pregnant in the ninth grade, though she recently began taking GED classes. (Tr. at 301.) While she denied any criminal history, Dr. Zaroff noted that her file indicated she spent three days in jail for domestic violence against her parents. (*Id.*) Currently, she lived with her mother, three-year old son, and twelve-year old sister, maintaining "okay" relationships with her family. (*Id.*) Her few friends were not "close." (*Id.*) During a typical day she dressed her son, fixed him breakfast, spent time playing with him, then attended GED classes while her mother took care of her son. (*Id.*) At night she watched television, studied, and put her son to bed. (*Id.*) She claimed to cook all of her own meals and that she could "take care of money I make," though she denied earning any. (*Id.*)

In the examination, Dr. Zaroff noted that she had appropriate contact with reality and organized mental activity, was "marginally cooperative," and had "no problems . . . with self-esteem, motor activity, or degree of autonomy." (Tr. at 302.) She denied delusions and suicidal ideations. (*Id.*) During the intelligence testing she "exhibited

---

[3] The administrative record presents very little information on her previous applications. The initial denial in this case referenced a claim filed in 2010 and closed in 2011, which ended at the initial level. (Tr. at 67.) One of the consultative examiners mentioned that the current claim was Plaintiff's fifth. (Tr. at 558.) Yet nothing indicates that there are prior ALJ determinations or any other decision implicating *res judicata. See* **Error! Main Document Only.Error! Main Document Only.**AR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Comm'r*, 126 F.3d 837 (6th Cir. 1997)).

15

limited interest and poor motivation," leading Dr. Zaroff to conclude that the resulting scores were "a valid but minimal estimate of her abilities." (Tr. at 303.) On the Wechsler Intelligence Scale she scored 71 on verbal, 64 on performance, and her full scale score was 65. (*Id.*) This last score placed her at "the first percentile in the extremely low range of functioning." (Tr. at 303-04.) Plaintiff struggled counting backwards by three, but knew the present president and his predecessor, named five large cities, and cited recent shootings as a current event. (Tr. at 302-03.)

Included in Dr. Zaroff's report were summaries of reports from other sources: Plaintiff's mother denied that Plaintiff was responsible with money; Plaintiff was referred to outpatient psychiatric therapy after her arrest; and another IQ test from 2001 found a full scale score of 69. (Tr. at 304.) Dr. Zaroff diagnosed "Mild Mental Retardation" and concluded that Plaintiff could not manage her benefit funds. (Tr. at 305.)

Various reports relating to her physical health also appear in the record. Relevant here are her denials of depression made in 2006 during a perinatal appointment and again in an emergency room visit. (Tr. at 362, 391.) During another session, in June 2008, she told the examiner that she lived "at home with her two kids, one and five years old," both from the same father, who lived elsewhere. (Tr. at 399.) Dr. Vinod Thomas, M.D., examined Plaintiff in October 2009 concerning chest pain, the notes from the visit indicating that Plaintiff was "[n]egative for depression," insomnia, and other psychiatric issues. (Tr. at 511.) Her mood, affect, and behavior were normal. (Tr. at 512.) Her March 2010 visit similarly failed to flag any psychiatric problems, with her mood, affect,

behavior, judgment, and thought content all "normal." (Tr. at 518.) She saw him again in October 2010, this time complaining of depression without suicidal ideation, hallucinations, memory loss, or anxiety; the doctor prescribed an antidepressant. (Tr. at 492-95, 520, 570.) She said the symptoms had persisted for the prior six to eight months. (Tr. at 520.) Nonetheless, her mood, affect, behavior, judgment, and thought content all appeared normal. (Tr. at 521, 570.) A questionnaire she completed scored her at the moderate to severe depression level. (Tr. at 572.)

In December 2010 Dr. Bruce Fowler, Psy.D., conducted a consultative examination in connection with Plaintiff's application for benefits. (Tr. at 465.) She recalled her learning disabilities in school, saying they covered all subjects and particularly affected her reading comprehension and mathematical aptitude. (*Id.*) She complained of depression, which manifested in lethargy, fatigue, insomnia, and irritability. (*Id.*) Her only work experience was from mandatory community service as a cleaner at the McNally House, but she claimed "[t]hey got rid of me, saying I wasn't performing right." (*Id.*) She was pregnant with her third child. (*Id.*) She had no history of psychiatric hospitalization or mental health services. (Tr. at 466.) Her two children lived with her in an apartment; she had "poor" relationships with other family members but remained close to her children. (*Id.*) A typical day included "sitting at home, feeding the kids, and looking at walls." (*Id.*) Plaintiff said she considered working "someday." (Tr. at 467.)

17

Dr. Fowler observed that Plaintiff "demonstrated good reality contact" and organized but vague speech. (*Id.*) No indications of delusions or hallucinations were apparent to Dr. Fowler, and Plaintiff denied considering suicide, explaining that she had only thought about it once. (*Id.*) "Her mood appeared somewhat flat," according to the report, but she was oriented, "able to perform two digits forward and two backward," and recalled two of three objects after three minutes. (*Id.*) However, unlike her interview with Dr. Zaroff, she could not name any past presidents, thought the current president was "Bush," failed to name any large cities, and could not think of any current events. (Tr. at 467-68.) Some of her other answers to the same questions varied as well; for example, whereas she knew what the phrase "Don't cry over spilled milk" meant in the 2005 session, she now claimed not to know. (Tr. at 303, 468.) During the Weschler Intelligence test, Dr. Fowler thought "she was quite cavalier in her responses" and answered a few questions "very briefly." (Tr. at 468.) He concluded that her full scale IQ score of 50 was "not an accurate measure" of her abilities "because of the nature of her response style." (Tr. at 469.) Her "intellectual abilities are probably well below average," he added. (*Id.*)

He diagnosed depression, learning disorder, and "[m]ild mental retardation (by prior psychological testing)." (*Id.*) "Her learning disabilities and intellectual limitations restrict the types of jobs for which she may be qualified." (Tr. at 470.) Specifically, she was "able to understand and follow only the simplest of directions. She would not be able

to do complex tasks or make independent work-related decisions." (*Id.*) Finally, she could not manage benefit funds. (*Id.*)

Roughly two months later, she told the doctor overseeing her pregnancy that since becoming pregnant she had stopped taking her depression medication and nonetheless was "doing well" and did not feel she needed treatment. (Tr. at 489, 499, 524.) Her doctor informed her that the psychotropic medications were safe and she could continue taking them if necessary. (Tr. at 490, 524.) After delivering the child in July 2011, the notes indicate there were "[n]o emotional concerns." (Tr. at 540.) Four months later, at a checkup, she desired to resume the antidepressant but said she was "doing well . . . without it." (Tr. at 543, 570.) The doctor prescribed a low dose with an option to increase if necessary. (*Id.*) The same month, she denied experiencing depression and was found to have normal mood and affect. (Tr. at 544.) In December 2011 she again denied depression, but continued to request a new prescription for antidepressants. (Tr. at 568.) A 2012 general report from her physicians listed "depressive disorder" under her medical history. (Tr. at 477, 510.) In February she called her doctors requesting a new antidepressant, as her current medication was "not working," and also a recommendation for a therapist. (Tr. at 547.)

Plaintiff underwent another consultative psychiatric examination in early 2012, this time with Dr. Leon Austin, Ph.D. (Tr. at 558.) She arrived alone, reportedly driving "someone else's car." (*Id.*) She explained that her disabilities arose from lifelong learning problems and depression. (*Id.*) The latter, present for seventeen years, resulted in

19

"feelings of worthlessness, social isolation, hopelessness about her future, anhedonia, decreased concentration, diminished libido, decreased motivation, sleep disturbances, irritability, and suicidal ideation every other day," though she had no plans to commit suicide. (*Id.*) She also reported that she still took an antidepressant and had attended mental health therapy twelve years prior. (*Id.*) All three of her children shared the same father, she reported. (Tr. at 558-59.) She again recalled that her lone work experience ended after two months because she failed to "do the paperwork right." (Tr. at 559.) She was not close to family and had no friends. (*Id.*) As she stated in prior examinations, she took care of her children during the day and shared responsibility for cooking and household chores with her sister. (*Id.*)

Dr. Austin noticed that her mood was depressed and concluded she did not minimize or exaggerate her symptoms. (*Id.*) "Her thoughts were spontaneous and well organized. There were no problems in pattern or content of speech." (*Id.*) Plaintiff claimed to see and hear "dead people," including Rosa Parks. (*Id.*) She correctly named five large cities and the current president, but could not name any past presidents; she also answered both of the abstract thinking questions that she struggled with in prior examinations. (Tr. at 560.) Dr. Austin thought Plaintiff continued to meet the diagnostic criteria for depressive disorder and though she seemed articulate and had completed tasks such multiplication and division, he retained her diagnosis of "[m]ild [m]ental [r]etardation." (Tr. at 561.) She could not manage her benefit funds. (*Id.*)

In April 2012 she was driving when a truck ran through a stop sign and slammed into her car. (Tr. at 564, 596.) At the hospital she mentioned her depression and requested an increased dosage of her antidepressant, which she had stopped taking in January. (Tr. at 565, 579.) She denied hallucinations. (Tr. at 564.) Notes from the following month indicate she received a new prescription for antidepressants. (Tr. at 564.)

Another psychiatric evaluation occurred in July 2012 with Dr. C.A.N. Rao, M.D. (Tr. at 573, 592.) She described the same symptoms she had expressed to other doctors, but added new information: her children all had different fathers, none of whom helped, and her parents also failed to assist her. (*Id.*) She denied suicidal thoughts. (Tr. at 574, 593.) Dr. Rao observed that she was alert and well-oriented, her thought processes were logical and relevant, and she had no acute psychotic symptoms. (*Id.*) His only diagnosis was bipolar disorder, which he planned to treat with medications. (*Id.*) The following month she reported to a physician that her depression was stable. (Tr. at 578.)

At a doctor's appointment in August 2012, she denied any problems concentrating and requested "a letter for community service that states she is able to do whatever is required of her." (Tr. at 577.) The final notes come from therapy sessions in the summer and fall of 2012. (Tr. at 608-15.) The notes are sparse. The beginning diagnoses were bipolar disorder mixed with psychosis, and Plaintiff reported hearing voices telling her to hurt herself. (Tr. at 611-13.) Her irritability and angry outbursts had persisted. (*Id.*) In the last session she denied suicidal thoughts and discussed her "strained relationships" with her siblings and parents. (Tr. at 608.)

2.        **Application Forms and Administrative Hearing**

In October 2010 Plaintiff filled out an Adult Function report as part of her application. (Tr. at 159-66.) She marked that she lived in an apartment with family. (Tr. at 159.) Asked how her illnesses prevented working, she wrote, "I got a mental problem. I dont [sic] mess with nobody." (*Id.*) During a typical day she got her children dressed for school, waited for them to come home, and cooked dinner. (Tr. at 160.) The foods she prepared, which took her "all day," included sandwiches, frozen dinners, and meals she baked. (Tr. at 161.) She marked that she did not take care of any dependents, such as children, yet she said that unnamed others helped her take care of her children by washing her clothes or sometimes cooking. (Tr. at 160.) Depression disrupted her sleep and sometimes it stopped her from bathing or dressing. (*Id.*) She needed reminders about personal care and her medicine. (Tr. at 161.) She wrote that she did no chores, but then answered below that she needed encouragement to complete them. (*Id.*) She could leave the house unaccompanied, knew how to drive, and shopped for food and clothes. (Tr. at 162.)

The next section asked if she could pay bills, count change, handle a savings account, or use a check book. (*Id.*) Four boxes were provided for checking either "Yes" or "No," and she marked both in all four, writing below, "I don't know nothing about checkbook." (*Id.*) She had no hobbies or social activities, and the only place she traveled to on a regular basis was her children's school. (Tr. at 163.) Communicating with others was difficult: "I dont like people and they dont like me I have a temper." (Tr. at 164 [sic

22

throughout].) Her impairments affected various abilities, including walking, completing tasks, concentrating, understanding, following instructions, and relating to others. (*Id.*) Asked how each of these was affected, she wrote, "I dont [f-word] with people." (*Id.*) In response to another question asking how long she could pay attention, she wrote, "pay attention too [sic] what." (*Id.*) She "hate[d]" authority figures such as the police and teachers and could not handle stress well. (Tr. at 165.) At a volunteer job she was fired because she "didnt do the job wright and [she] didnt talk to people didnt follow Instructions." (*Id.* [sic throughout]) Finally, she heard voices and had "suaside [sic] thoughts." (Tr. at 165-66.)

Her mother filled out a similar form for Plaintiff the following year. (Tr. at 171-78.) Many of the answers mirror Plaintiff's. Plaintiff was still living with family in an apartment. (Tr. at 171.) Her mother said that Plaintiff took care of her children without help. (Tr. at 172.) Plaintiff needed reminders to take medicine and complete other tasks, and she did not always attend to her personal care. (Tr.at 172-73.) She cooked and washed clothes and dishes but needed encouragement to complete these chores. (Tr. at 173.) According to her mother, Plaintiff could pay bills and count change, but not handle a savings account or use a checkbook. (Tr. at 174.) In the list of activities affected by her impairments, Plaintiff's mother added talking and memory to the items Plaintiff had selected, estimated that she could pay attention only for "a few seconds," and noted that Plaintiff struggled with authority figures and could not follow directions, which caused her to lose her job. (Tr. at 176-77.)

23

At the administrative hearing on November 28, 2012, Plaintiff testified that she dropped out of school before finishing the ninth grade and had never attempted to earn a GED. (Tr. at 38.) Her only work experience came through the community program called Work First that she participated in after dropping out. (*Id.*) The program provided cash assistance and required her to attend classes and fill out paperwork. (Tr. at 39.) She remained in the program for "some years," she stated, but was terminated for incorrectly completing the paperwork. (Tr. at 39-40.) Later she recalled that the program lasted for only a few months. (Tr. at 53.) She characterized other assignments in the program as volunteer work, which included cleaning for a nursing home. (Tr. at 40.)

Her learning disability precluded work, she said, adding that she had applied for cashier positions in the past but never received an offer. (Tr. at 43-44.) Despite difficulties with the application forms, she was able to complete them by herself, which upon reflection she thought might explain why she never got a call back. (Tr. at 44.) She was willing to work, she said, and had entered a jobs program through Michigan Works but was kicked out for improperly completing the paperwork. (Tr. at 53.) In addition to her learning disability, she discussed her depression, stating that she needed reminders to take her medication. (Tr. at 55-56.) Other symptoms included aural hallucinations and compulsively pulling out her hair. (*Id.*)

Her family helped raise her children, providing monetary support. (Tr. at 40-41.) Her children's father also was "around sometimes" to help, and although he did not pay child support he sometimes purchased necessities. (Tr. at 41.) On a normal morning she

24

helped her children with their clothes, but her mother or sister would come over at night to help sort the clothes for the week. (Tr. at 44-45.) Her father brought the children to school. (Tr. at 45.) Breakfast was at school, so Plaintiff did not cook in the mornings. (*Id.*) Her youngest child was not old enough to attend school, and during the day they watched television with her father. (Tr. at 45-46.) She was able to register her children for school and attend parent-teacher meetings. (Tr. at 51, 52.)

She had lived alone with her children for two years, after moving out of her mother's home. (Tr. at 51.) She sometimes cooked dinner, and sometimes shopped for groceries, but her mother needed to prepare the grocery list and someone had to go with her. (Tr. at 46-47.) She could shop alone, however (Tr. at 47), and she did no household work unless her sister helped. (Tr. at 49.) She never had a checking or savings account and the cash assistance she received came through a card she knew how to use, though others sometimes helped her with paying bills. (Tr. at 47-48.) Some bills she could pay without assistance. (Tr. at 48.) Her mother filled out the paperwork for the other benefits she received, including Medicaid and food stamps, among others. (Tr. at 48-49.) She did successfully complete the written portion of the driver's license examination on her second attempt. (Tr. at 60.)

The ALJ then asked the vocational expert ("VE") to

Consider a hypothetical individual of the claimant's age, having a limited education, no past relevant work experience, with the physical capacity to perform work at all exertional levels. However, the work should consist of simple, routine, repetitive tasks performed in a work environment free of fast-paced production requirement, involving only simple work-related decisions, and with few if any workplace changes;

25

> also limiting the individual to work that involves only occasional
> interaction with the public or coworkers, working best alone or in small,
> familiar groups.

(Tr. at 62.) Could that individual perform work? the ALJ inquired. (*Id.*) Yes, the VE responded, providing the following examples: custodian positions (38,000 in Michigan); "some laborer positions" (17,000 in Michigan); and "some dish washer[]" positions (8000 in Michigan). (*Id.*) None of those jobs required the individual to compute or calculate numbers. (*Id.*) Tweaking the hypothetical, the ALJ changed the restrictions so that the individual could not remember or carry out "very short and simple instructions," sustain ordinary routines without frequent supervision, work in coordination with others, interact with the public, make simple work-related decisions, and would be absent or late more than three times per month and off-task over a quarter of the workday. (Tr. at 63.) That individual could not perform any work, according to the VE. (*Id.*)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that Plaintiff had the RFC to

> [p]erform a full range of work at all exertional levels but with the following
> nonexertional limitations: the claimant is able to perform simple, routine,
> repetitive tasks. She is limited to working in an environment free of fast-paced
> production requirements with simple work-related decisions, and few, if any,
> work place changes. The claimant is limited to no more than occasional
> interaction with the public and coworkers. She would work best alone or in a
> small familiar group.

26

(Tr. at 17.) After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence: Governing Law and Analysis

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld. In this case, Plaintiff argues that she meets or equals listing 12.05(C), and that the ALJ's decision to the contrary was in error.

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. §§ 404.1520(a)(3); 416.920(a)(3); *Wyatt*, 974 F.2d at 683. Claimants with severe impairments that meet or equal a listing in the Appendix are deemed disabled without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Fitting a claimant into a listing is dispositive: listed impairments preclude any gainful activity, not just substantial gainful activity. *See Zebley*, 493 U.S. at 525; 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id. See also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). Alternatively, medical equivalence to a listing can occur in three situations where the claimant fails to meet all of the criteria:

(1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 n.2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526).

The ALJ retains discretion at this stage, and does not need to attach "any special significance to the source of a[] [medical] opinion . . . [regarding] whether an impairment meets or equals a listing." 20 C.F.R. § 404.1527(d)(3). This is particularly true for the first part of the analysis: "'[A]n ALJ is capable of reviewing records to determine whether a claimant's ailments *meet* the Listings . . . .'" *Stratton v. Astrue*, 987 F. Supp.2d 135, 148 (D. N.H. 2012) (quoting *Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D. Tex. May 23, 2008)). The Commissioner, however, has qualified the ALJ's discretion to decide equivalence, noting that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3. An expert's opinion in a Disability Determination Transmittal Form can satisfy this requirement. *Hayes v. Comm'r of Soc. Sec.*, No. 11-14596, 2013 WL 766180, at *9 (E.D. Mich. Feb. 4, 2014), *Report & Recommendation adopted*, 2013 WL 773017 (E.D. Mich. Feb. 28, 2013).

The ALJ's step-three explanation is held to the same standard as the rest of the decision, and the ALJ does not need to "spell[] out every consideration that went into the step three

28

determination" or recount every fact discussed elsewhere in the decision. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). No particular format is prescribed, and reviewing courts will read the decision "as a whole . . . to ensure there is sufficient development of the record and explanation . . . ." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (noting that the ALJ does not need "to use particular language or adhere to a particular format in conducting his analysis"). Nor must the ALJ place the entire analysis underneath the "Listing" heading; the court can examine the ALJ's entire decision to decide whether the step three analysis is adequate. *See White v. Colvin*, No. 4:12-cv-11600, 2013 WL 5212629, at *7 (E.D. Mich. Sept. 16, 2013) (citing, 165 F. App'x at 411). The claimant carries the burden of proof at step three and therefore, as the Third Circuit has observed, the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that she meets the Listing. *Ballardo v. Barnhart*, 68 F. App'x 337, 339 (3d Cir. 2003) (finding that a conclusory, single-sentence analysis was adequate where the claimant "presented essentially no medical evidence of a severe impairment").

The Sixth Circuit has held that in order to meet a listed impairment under 12.05, a plaintiff must satisfy the diagnostic description or definition as well as the severity requirements listed in subsections (A) through (D). 20 C.F.R. § 404.1520, Subpart P, App. 1, listing 12.05; *Foster*, 279 F.3d at 354-55. To satisfy listing 12.05(C), a claimant must show that (1) he experiences significantly subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested during the developmental period (i.e., before the age of twenty-two); (2) he has a verbal, performance, or full scale IQ of 60 through 70; and (3) he suffers from a physical or other mental impairment imposing an additional and significant

work-related limitation on function. *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The first prong is called the "diagnostic description," and applies to all of Listing 12.05's alternative requirements. *Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007).[4]

The necessary severity of the adaptive functioning deficits is not specified in the regulations. *McCellan v. Comm'r*, 804 F. Supp. 2d 678, 694 & n.12 (E.D. Tenn. 2011). It is clear, however, that IQ scores alone are insufficient to satisfy Listing 12.05(C). *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 7 (6th Cir. 2004) ("[T]wo IQ scores of 70, without more, do[] not satisfy the requirements of listing 12.05(C)."). Moreover, an "actual diagnosis of mental retardation is not required to satisfy listing 12.05(C), but the ALJ may consider the fact that no such diagnosis exists." *Bason v. Comm'r of Soc. Sec.*, No. 12-15033, 2014 WL 1328168, at *14 (E.D. Mich. Mar. 31, 2014).

Instead, courts look to "a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698

---

[4] Plaintiff declines to press a listing 12.05(B) argument. (Doc. 9 at 6.) That listing is satisfied by a "valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. pt. 404, subpt. P, App. 1. § 12.05(b). Two scores in the record here potentially meet this criterion, but Plaintiff considers both invalid. (Doc. 9 at 6.) The more recent qualifying score was from Dr. Fowler's test, but he concluded that it was invalid. (Tr. at 469.) *See Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 462 (6th Cir. 2012) ("The ALJ may choose to disregard I.Q. scores that would normally lead to a finding of disability when those scores were undermined by a doctor's full evaluation."). Plaintiff writes off the other test because she took it at age ten, citing to listing 112.00(D) for the proposition that tests before the age of sixteen "are not necessarily reliable." (Doc. 9 at 6 n.1.) However, in examining whether a test taken at age fourteen showed adaptive functioning issues, the Sixth Circuit rejected the Commissioner's reliance on this same listing, 112.00(D), for the same proposition. *Dragon*, 470 F. App'x at 461 n.2. Moreover, when rejecting listing 12.05(B), the ALJ here acknowledged the older test and failed to explicitly find it invalid. (Tr. at 15.) Instead, he rejected the listing because he found that the more recent test was invalid and that Plaintiff lacked the required deficits in adaptive functioning. (*Id.*) Nonetheless, Plaintiff has not offered the listing 12.05(B) argument because the central dispute here is the ALJ's adaptive functioning analysis. Also, *Dragon* is not directly on point because the analysis there centered on adaptive functioning during the developmental period, where a test taken during the claimant's youth would be probative; here, in dealing with the standalone 12.05(B) requirement, the insufficiencies of IQ testing before age sixteen, pointed out in listing 112.00(D), might have more weight.

(6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). The Sixth Circuit has also interpreted this term in light of non-binding definitions given by "leading professional organizations[.]" *Hayes*, 357 F. App'x at 677 (citing *Technical Revisions to Medical Criteria for Determinations of Disability*, 67 Fed. Reg. 20,018, 20,022 (2002)). The definition employed in that case came from the American Psychiatric Association, which "defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Id.* (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 49 (4th ed., text rev. 2000)). In another case, the Sixth Circuit suggested that claimants fail to meet the diagnostic description if they can "perform relatively complicated tasks." *Foster*, 279 F.3d at 355. At least one lower court has used this standard to gauge a claimant's deficits. *See McCellan*, 804 F. Supp. at 694.

The ALJ here explained the insufficiency of Plaintiff's adaptive deficits by citing a variety of evidence, almost all of which relates to her ability to care for her children. (Tr. at 16.) Specifically, he noted that she helped her children dress, prepared meals, and arranged for her mother to watch the children while she attended GED classes. (*Id.*) Evidence that Plaintiff needed substantial assistance to complete these tasks was contradicted, the ALJ noted, by a few statements from Plaintiff to the effect that she received no help from others. (*Id.*)

In the RFC analysis and other sections of the decision, the ALJ relied on examination notes in which Plaintiff reportedly said she could "count money and use math in daily life adequately," she received "mostly C's" in school, she could drive, she shopped independently,

31

she took GED classes, she testified "that she did not know why she is unable to work," and she said "she would like to be able to work at some point." (Tr. at 18, 20.) The ALJ also observed her questionable motivation during the examinations, the "generally unremarkable" treatment she received for depression, and her ability on some occasions, but not others, to answer mathematical questions during examinations. (Tr. at 18-19.) Further, the ALJ relied on a reviewing agency psychologist's opinion, formed after examining the records, that Plaintiff could perform simple tasks. (Tr. at 20, 72-74.) According to the ALJ, this opinion was consistent with her ability to raise children and was also confirmed by Dr. Fowler's opinion. (Tr. at 20.) She rejected Dr. Austin's opinion because it was based on a single examination, he considered her invalid 2005 IQ score, and during a different examination Dr. Zaroff believed that Plaintiff's concentration was appropriate. (Tr. at 20-21.)

Plaintiff contends that the ALJ erred in finding that Plaintiff did not meet listing 12.05(C). She highlights two specific errors. First, she argues that the ALJ's discussion of the IQ score requirement was "vague and inconclusive" because it ignored qualifying scores from 2005 and did not assess the validity of scores from 2000. (Doc. 9 at 7.) In fact, she adds, the 2005 score was the only IQ result explicitly deemed valid by the examiner. (*Id.* at 7-8.) Second, and more importantly, Plaintiff asserts that the adaptive functioning analysis does not support the ALJ's conclusion. (*Id.* at 8-12.) The activities, by themselves, are not inconsistent with the listing and, moreover, the ALJ erroneously discounted her testimony that she required assistance to complete them. (*Id.* at 9-10.) Other evidence supported her testimony, she claims, and in any case the evidence cited by the ALJ is not probative of deficits "prior to age 22." (*Id.* at 10.)

32

Breaking down adaptive functioning into its components, Plaintiff attempts to show deficits in each. (*Id.* at 10-12.) Her academic skills were undoubtedly impaired as evidenced by the special education records. (*Id.* at 10.) Her communication and interpersonal skills similarly displayed deficits, verified by repeated observations of her shyness, struggles with reading comprehension, and lack of friends. (*Id.* at 10-11.) In her reply brief, she notes that completing basic, daily activities are not the sort of "'relatively complicated tasks'" that disqualify a claimant from meeting the diagnostic requirement. (Doc. 17 at 3-5 (quoting *McCellan*, 804 F. Supp. 2d at 694.) The ALJ failed to examine her functioning prior to age twenty-two, focusing instead on her mothering skills. (*Id.* at 4-5.) The brief also asserts that the ALJ improperly found the last prong of the 12.05(C) analysis was not met; that is, that Plaintiff did not have other impairments imposing significant, additional work-related limitations. (Doc. 17 at 2 (citing Tr. at 16).) Plaintiff contends that the other severe impairments found at step two satisfy this requirement.

The Commissioner points out that the ALJ did mention the 2005 test scores during the RFC analysis; nonetheless the Commissioner assumes, without conceding that the 2005 scores would satisfy listing 12.05(C)'s testing requirement. (Doc. 15 at 17.) Even so, the Commissioner argues, the ALJ properly found insufficient adaptive deficits and therefore Plaintiff could not meet the listing. (*Id.* at 17-24.) A host of cases support a finding that living independently negates the requisite adaptive functioning deficits, according to the Commissioner. (*Id.* at 19-20.) Plaintiff's case is further refuted by her ability to raise her children, as cases from other circuits demonstrate. (*Id.* at 23 n.6.) The ALJ also properly navigated through the contradictory statements about how much help she received from her

33

family. (*Id.* at 20-22.) Finally, the Plaintiff presented selective evidence when discussing the components of adaptive functioning. (*Id.* at 22-24.)

This case presents a close question that turns upon the adaptive functioning analysis. That portion of the analysis is the relevant one because the ALJ did not adequately address the final two elements in the analysis: Plaintiff's IQ scores and additional and significant work-related limitations. Yet, if the adaptive functioning analysis has substantial support despite these errors, then the ALJ properly determined that Plaintiff failed to meet the listing. *See Grillot v. Astrue*, No. 3:11cv00374, 2012 WL 5493969, at *13 (S.D. Ohio Nov. 13, 2012) (finding that ALJ properly concluded the claimant did not meet the diagnostic description, and thus the ALJ's "incorrect invalidation of Plaintiff's IQ test scores [was] harmless error"), *Report & Recommendation Adopted by* 2012 WL 6728361, at *2 (S.D. Ohio Dec. 28, 2012).

Regarding listing 12.05(C)'s other prongs, the ALJ provided a vague and incomplete analysis at best. It is unclear whether the ALJ believed that any of the IQ scores met the listing. An ALJ can reject the validity of test results if supported by sufficient evidence and analysis. *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 721 (6th Cir. 2012) (holding that "the mere fact of a qualifying IQ score does not require that the ALJ find mental retardation under Section 12.05B when substantial evidence supports the contrary conclusion or the claimant's allegations of her capabilities are deemed not credible"); *Hancock v. Astrue*, 667 F.3d 470, 474 (4th Cir. 2012) ("This circuit permits an ALJ to weigh conflicting IQ tests results.").

That did not occur here. In a paragraph of analysis, the ALJ begins by stating, "Finally, the 'paragraph C' criteria of listing are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 . . . ." (Tr. at 16.) Yet a few lines later

34

she said, "The medical evidence of record indicates that the claimant has IQ scores below 70."
(*Id.*) She spent only two additional sentences analyzing the matter and failed to actually opine
on any test's validity. Of the numerous IQ scores in the record, the ALJ only addressed only
three, and even this truncated analysis never concluded whether the testing prong was met. (Tr.
at 16.) The ALJ noted the 1997 and 2001 tests, both of which contained scores in the 60's,
satisfying listing 12.05(C). Interestingly, the only mention of the 2001 test in the record comes
from Dr. Zaroff's 2005 test report, which the ALJ otherwise ignored in the listing section. (Tr.
at 16, 304.) Nowhere in the decision did the ALJ examine whether these scores were valid—
the only score found invalid was from 2010, which Dr. Fowler determined did not represent
her intellectual functioning. (Tr. at 16, 19.) The ALJ seemed to implicitly discredit the 1997
and 2001 results by mentioning a 2000 test that contained no scores below 70, the only such
test in the record. (Tr. at 16, 288.) ALJs can weigh conflicting IQ results, but the ALJ here
simply cited to them without giving reason to prefer one over the other. *See generally
Hancock*, 667 F.3d at 474. Dr. Zaroff's 2005 test, with a verbal score of 64 and a full scale
score of 65, is unmentioned in the relevant analysis. (Tr. at 303.) Elsewhere in the opinion the
ALJ described the test and Dr. Zaroff's conclusion that it was valid, but a minimal estimate of
her intelligence. (Tr. at 18.) Again, however, the ALJ never analyzed whether it was in fact
valid. Thus, while she may have considered the examination for purposes of the RFC, she did
not adequately address it under listing 12.05(C). *Cf. White*, 2013 WL 5212629, at *7 (noting
that the entire listing analysis does not need to be placed under the listing "heading").

The ALJ provided no explanation whatsoever for why Plaintiff lacked "a physical or
other mental impairment imposing an additional and significant work-related limitation of

35

function." 20 C.F.R. pt. 404, subpt. P, App. 1 § 12.05(C). This was erroneous. The regulations state that to meet this requirement, the impairment must be "a 'severe' impairment[], as defined in §§ 404.1520(c) and 416.920(c)." *Id.* § 12.00(A). Those regulations define the severity level necessary to satisfy the step-two analysis. "Therefore, this prong of the paragraph C criteria is met if the ALJ finds, at Step 2 of the sequential disability analysis, that the claimant suffers from a severe physical or mental impairment that is distinct from the claimant's low IQ." *Hutchinson v. Comm'r of Soc. Sec.*, No. 12-cv-11337, at *15 (E.D. Mich. Aug. 29, 2013) (adopting Report & Recommendation); *see also Osborne v. Comm'r of Soc. Sec.*, No. 1:13cv1574, 2014 WL 4064078, at *9 (N.D. Ohio Aug. 15, 2014) (same); *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50,746, 50,772 (2000) (same). The ALJ here found such additional impairments at step two: depressive disorder and bipolar disorder. (Tr. at 13.) Moreover, she crafted restrictions in the RFC to accommodate these impairments. (Tr. at 19.) Consequently, she erred at step three by finding Plaintiff did not satisfy this element.

This leaves the adaptive functioning analysis. While the various parts of listing 12.05(C) are analytically separate, the errors in two of the three elements cast doubt on the ALJ's examination of the remaining element. The ALJ's reasoning in this portion of her decision relied almost exclusively on Plaintiff's ability to keep her children from the clutches of Child Protective Services and to avoid eviction. (Tr. at 16.) Undergirding this view is the ALJ's evident decision to discredit Plaintiff's statements that her family provided substantial assistance in raising her children and running her household. It is true that an ALJ's credibility determinations "are to be given great weight." *Cruse*, 502 F.3d at 542; *see also Rogers*, 486

36

F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). However, courts have been wary of "unpersuasive attempts to turn the fact that the plaintiff is the mother of . . . children, whom she chose not to abandon, into bases for disbelieving her testimony." *Dennis v. Astrue*, 655 F. Supp. 2d 746, 756 (W.D. Ky. 2009); *but see Temples v. Astrue*, No. 1:11CV-00090-JHM, 2012 WL 590814, at *5-7 (W.D. Ky. Jan. 24, 2012); *Andersen v. Astrue*, No. 3:11-cv-250-JAG, 2012 WL 4498921, *7, 14-16 (E.D. Va. June 15, 2012). In a similar context, where the plaintiff attended school while allegedly disabled, the Sixth Circuit lauded her "courage and determination in refusing to surrender to the debilitating effects of her illness." *Coehn v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 530 (6th Cir. 1992). Here, Plaintiff's devotion to her children does not offer strong evidence to discredit her general testimony.

Moreover the evidence that she raised her children without help is not as probative as the ALJ suggested. It is true that courts frequently cite claimants' ability to care for their own daily needs or those of their children as a reason for finding they do not meet the diagnostic description in listing 12.05. *See, e.g.*, *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 585, 585 (6th Cir. 2013); *Talavera v. Astrue*, 697 F.3d 145, 153 (3d Cir. 2012); *Courter*, 479 F. App'x at 715; *Hayes*, 357 F. App'x at 677; *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007); *West*, 240 F. App'x at 698; *Pugh v. Comm'r*, No. 2:13-cv-944, 2014 WL 4915684, at *5 (S.D. Ohio Sept. 30, 2014), *adopted by* 2015 WL 1000452, at *3-5 (S.D. Ohio Mar. 5, 2015); *Osborne*, 2014 WL 4064078, at *9-10; *Robinson v. Comm'r of Soc. Sec.*, No. 2:13-cv-530, 2014 WL 3419309, at *9 (S.D. Ohio July 10, 2014), *Report & Recommendation adopted by* 2014 WL 4748483, at *1 (S.D. Ohio Sept. 23, 2014); *Richardson v. Colvin*, No. 2:13-CV-101, 2014 WL

2507927, at *8 (E.D. Tenn. June 4, 2014) (adopting Report & Recommendation); *Deloach v. Comm'r of Soc. Sec.*, No. 1:13-cv-170, 2014 WL 533591, at *13 (S.D. Ohio Feb. 11, 2014), *Report & Recommendation adopted by* 2014 WL 935305, at *1 (S.D. Ohio Mar. 10, 2014); *see also McClellan v. Astrue*, 804 F. Supp. 2d 678, 693 (E.D. Tenn. July 7, 2011). These cases do not, however, stand for the proposition that raising children can constitute the sole reason for finding adequate adaptive functioning. In all but one of these cases the crucial evidence of adaptive functioning came from something other than raising a family; generally, it was the claimant's extensive work history.[5] Plaintiff here has no work experience except through a cash assistance program, which hardly provided significant experience or demonstrated adequate functioning.

---

[5] *See Justice*, 515 F. App'x at 585 (claimant had "worked as a light welder, material handler, factory laborer, heavy equipment operator, construction laborer, factory assembler, and painter," which included semiskilled positions; he received unemployment benefits conditioned on his assertion that he was ready and able to work; and the medical reports the ALJ credited "support the less severe diagnosis of borderline intellectual functioning, rather than mental retardation"); *Talavera*, 697 F.3d at 148-49, 153-54 (claimant nearly finished high school, attended business school, managed personal finances, worked without mental difficulties, she testified, as a receptionist, cashier, and telemarketer, and no medical professionals thought her impairments would prevent adaptive functioning); *Courter*, 479 F. App'x at 729 ("She had extensive prior work history as a cleaner and prep cook for several different companies, and she explicitly testified at her hearing that she was mentally capable of continuing that work," and "[n]one of the experts diagnosed Claimant with mental retardation, and they opined that she did not qualify as mentally retarded under Section 12.05."); *Hayes*, 357 F. App'x at 676-77 (claimant had "mentally challenging jobs" in the past, during years of therapy no psychologist indicated claimant had "limited intellectual functioning," and she shopped, managed finances, and cared for herself and her husband); *West*, 240 F. App'x at 698 (claimant "held a long-term, full-time position" with the city government, worked part-time as his health deteriorated, paid bills, shopped, interacted with others, and engaged "in numerous other daily activities," and examiners did not diagnose mental retardation); *Pugh*, 2014 WL 4915684, at *1, 5 (claimant received "good grades" in school and held numerous jobs after high school graduation, including "semi-skilled work"); *Osborne*, 2014 WL 4064078, at *1-2, 9-10 (claimant had various jobs after finishing the tenth grade, passed general state proficiency tests, attended special education classes only a fifth of the day, babysat for others, and testified that she related well with coworkers and caught on to job-related tasks); *Robinson*, 2014 WL 3419309, at *1-2, 9 (claimant was married, enjoyed reading, and worked for years as a nurse and in restaurants); *Richardson*, 2014 WL 2507927, at *5-6, 8 (claimant shopped, fished, hunted, made wood crafts, and had a history of self-employment and also semiskilled work over twenty years); *Deloach*, 2014 WL 533591, at *5, 13 (claimant was not in special education and worked as a childcare provider for Human Services); *see also McClellan*, 804 F. Supp. 2d at 684-85 (claimant had past work experience).

The view the ALJ espoused here, finding adequate adaptive functioning by virtue of the fact that claimant was not a failure as a mother, finds arguable support in only one of the above cases; but the brief discussion in that case—the whole opinion spans less than one page—provides insubstantial support. *Novy*, 497 F.3d at 709. In that decision, the Seventh Circuit characterized adaptive functioning as "denot[ing] inability to cope with the challenges of ordinary everyday life." *Id.* The court thought it sufficed that claimant could raise three children "without help, feeding herself and them, taking care of them sufficiently well that they have not been adjudged neglected and removed from her custody by the child-welfare authorities, paying her bills, [and] avoiding eviction." *Id.* Without more, the court upheld the ALJ's findings.

As an initial matter, the court in *Novy* found no dispute that the claimant raised her children "without help." 497 F.3d at 709. Here, despite the deference owed to the ALJ's credibility decision, the Court need not ignore the contrary evidence. More importantly, the Sixth Circuit has pointed the analysis in a different direction. First, the *Novy* court applied a lower standard for adaptive functioning than the Sixth Circuit suggested in *Foster*, which asked whether the claimant could "perform relatively complicated tasks." *Foster*, 279 F.3d at 355; *see also McCellan*, 804 F. Supp. at 694.

Moreover, the Sixth Circuit has found that even more complicated activities are not inconsistent with adaptive functioning deficits rendering a claimant intellectually disabled. In *Brown v. Secretary of Health and Human Services*, the court examined the types of activities congruent with meeting listing 12.05(C). 948 F.2d 268, 270 (6th Cir. 1991). The court looked to the leading professional group's description of the impairment underlying 12.05(C), then

called "Mild Mental Retardation": Persons with this disability "'*can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support* . . . .* [and] *virtually all people with Mild Mental Retardation can live successfully in the community, independently*, or in supervised apartments or group homes.'" *Id.* (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 49 (3d ed., 1987)). The specific legal question the court faced was whether the ALJ properly invalidated the claimant's full scale IQ score of 68 in light of the claimant's ability "to use public transport," do his own laundry, make change at a grocery store, follow a road atlas, read a newspaper, and his ability in the past to work as a truck driver, recording mileages and hours driven. *Id.* Considering the definition of "Mild Mental Retardation," the court found that none of these facts were "inconsistent with a valid test I.Q. of 68." *Id.* Further, the court noted that the Commissioner, "in promulgating Listing 12.05 C, expressly singled out individuals with Mild Mental Retardation for special treatment in determining entitlements to disability benefits," and that both the claimant's scores and "biography fit[] squarely within [the professional] profile of a mildly retarded individual." *Id.*

Recently, the Sixth Circuit again addressed the appropriateness of invalidating IQ scores in a case similar to the present. In *Dragon v. Commissioner of Social Security*, the ALJ found there were no adaptive functioning deficits in the developmental period largely because the ALJ disregarded a qualifying IQ score from that period on the grounds that the testing took place when the claimant was a child. 470 F. App'x 454, 460-61 (6th Cir. 2012). Describing how this flipped the diagnostic definition on its head, the Sixth Circuit emphasized the importance of childhood IQ scores and school records when determining adaptive functioning.

In particular, the court found persuasive the fact that the claimant proceeded "in a separate educational program," had a mild articulation delay, qualified for speech therapy, and did not pass ninth-grade proficiency tests. *Id.* at 461. The observations in *Brown* were reaffirmed in the court's discussion of why the ALJ placed undue emphasis on the claimant's high school graduation and motherhood. *Id.* at 463. While the claimant eventually graduated, it was through an individual program and she had evident academic deficiencies; further, her "good relationship with her daughter" was partially enabled by living with the daughter's father, the claimant's eventual husband. *Id.* Consequently, the ALJ's analysis of the first two elements in the listing was unsupported by substantial evidence and the court remanded "for an immediate award of benefits." *Id.* at 467. Judge Danny Boggs, concurring in part, agreed that the ALJ erred but would have remanded for reevaluation. *Id.* at 467-68.

Other cases from across the country have reflected the analyses in *Brown* and *Dragon*. For example, the court in *Brooks v. Astrue*, found that the ALJ erred by disregarding the claimant's "poor performance in special education" during the step three analysis. No. 2:10-CV-00037, 2011 WL 3882283, at \*7 (E.D. N.C. Aug. 17, 2011), *Report & Recommendation adopted by* 2011 WL 3904104, at \*1 (E.D. N.C. Sept. 2, 2011). According to the court, the ALJ's brief reference to the school records when discussing the claimant's current RFC was inadequate to demonstrate a proper step three analysis. *Id.* Another error, even more pertinent to the present case, also marred the ALJ's analysis: The ALJ used the claimant's ability to raise a child, work, and complete household chores as the almost lone evidence that the claimant did not have adaptive functioning deficits. *Id.* at \*8. These facts were not inconsistent with intellectual disability under 12.05(C) and thus, the court concluded, "because the ALJ relied

41

almost exclusively on the fact that Claimant had worked and performed other tasks in the past . . . the Court finds that the ALJ appears to have placed improper weight on this type of evidence." *Id.*

A similar adaptive functioning analysis was found inadequate in *Radford v. Astrue*, No. 5:08-CV-421, 2009 WL 165958, at *6 (E.D. N.C. June 10, 2009) (adopting Report & Recommendation). The ALJ did not isolate and examine intellectual functioning during the developmental period, but rather merely concluded there were no deficits due to the claimant's ability to complete household chores, raise a family, marry, and work for several years. *Id.* The court rejected this simplistic assessment: "[T]he fact an individual is able to work, complete household chores, and raise a family is not inconsistent with mild mental retardation." *Id.* (citing *Durden v. Astrue*, 586 F. Supp. 2d 828, 839 (S.D. Tex. 2008)). In support, the court cited *Brown* and other cases that interpreted listing 12.05(C) as "'assum[ing] many, if not most, mildly mentally retarded individuals will be able to work,'" but that such individuals become disabled when, as the listing envisions, their intellectual problems combine with an additional and significant impairment. *Id.* (quoting *Muntzert v. Astrue*, 502 F. Supp. 2d 1148, 1158 (D. Kan. 2007)).

Other courts have observed that individuals with intellectual disabilities under listing 12.05(C) may "'be able to understand simple oral instructions, and to be able to carry out those instructions under somewhat closer supervision.'" *Grenham v. Astrue*, No. 08-CV-11151, 2009 WL 1209026, at *5 (D. Mass. May 4, 2009) (quoting *Flagg v. Barnhart*, No. 04-45, 2004 WL 2677208, at *5 (D. Me. Nov. 24, 2004)). In *Grenham*, the court also noted that a "person with mild mental retardation may be able to maintain a household, care for children, and obtain a

42

GED." *Id. See also Ouellette v. Apfel*, No. 00-112, 2000 WL 1771122, at *2-4 (D. Me. Dec. 4, 2000) (Report & Recommendation) (finding that ability to independently maintain a household and raise two children was not inconsistent with intellectual disability under 12.05(C)). The First Circuit has likewise explained that the structure of listing 12.05(C) indicates that "mild . . . retardation" demonstrated by qualifying IQ scores and other medical evidence does not alone prevent a claimant from sustaining work, which is why 12.05(C) imposes the additional and significant impairment requirement. *Nieves v. Sec'y of Health & Human Servs.*, 775 F.2d 12, 14 (1st Cir. 1985).

In light of this case law, I suggest that the ALJ's decision is not supported by substantial evidence. Unlike the cases where raising children constituted a valid consideration, Plaintiff here did not also display other signs of adequate adaptive functioning, such as a lengthy work history or an undoubted ability to manage personal finances and a household. The ALJ instead concluded that raising children in an independent household sufficed, and to reach this conclusion the ALJ had to discredit the relatively consistent evidence that Plaintiff required significant assistance in these activities. Such an approach to the analysis ignores the multifaceted components comprising adaptive functioning, as laid out by the Sixth Circuit from the non-binding works by professional psychiatric associations. These components include effectiveness in social skills, communication, and daily living skills, *West*, 240 F. App'x at 698, or the test employed by the Sixth Circuit in *Hayes*, which cited the leading manual's definition: concurrent deficits in at least two areas, including "'communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction,

functional academic skills, work, leisure, and safety.'" 357 F. App'x at 677 (quoting Am. Psychiatric Ass'n, DSM-IV at 49).

Using these factors to examine the record represents the proper mode of analysis, which the ALJ did not undertake. A particularly glaring gap is the ALJ's failure to closely analyze Plaintiff's school records. While poor academic performance does not alone show adaptive functioning deficits, *Hayes*, 357 F. App'x at 677, the comprehensive school records here extend well beyond her academic aptitude and touch upon all facets of adaptive functioning during the developmental period, often with observations and testing from expert sources. They demonstrate significant issues with communication, academic skills, and social ability. The very first report documents her problems with reading comprehension, and during a subsequent examination with the school psychologist she displayed poor attention and problem solving skills, and often ignored his questions. (Tr. at 229.) The struggles with reading comprehension and appropriate behavior continued throughout her schooling, especially with communication. (Tr. at 249-51, 260, 262, 287.) In mathematics, she struggled to do more than simple addition and subtraction and, in her eighth-grade year functioned at a third-grade level. (Tr. at 263, 280.)

It appears that most of her schooling was through the special education program, and that while she passed some classes, she failed or earned low marks in others. (Tr. at 259, 268, 277, 287.) Overall, the records show academic functioning deficits. However, the records also provide some countervailing evidence. For example, the team reports twice concluded that her underachievement did not "primarily" result from "mental retardation." (Tr. at 225, 285.) The two expert reports in the school records also suggest she performed in the borderline or low-

44

2:14-cv-12588-GCS-PTM   Doc # 18   Filed 05/21/15   Pg 44 of 50   Pg ID 762

average range, though Dr. Knack's report observed that Plaintiff had difficulty working independently. (Tr. at 231, 288.) In short, the ALJ needed to parse these records so that the adaptive functioning analysis could better reflect the various facets of adaptive functioning. Additionally, the ALJ did not sufficiently address Plaintiff's sparse and allegedly unsuccessful work experience, which represents another consideration in the analysis. (Tr. at 38-40, 465, 559.)

Considering the importance the ALJ placed on Plaintiff's ability to independently care for her children, the ALJ's credibility assessment becomes critical. On this point, I suggest that the ALJ failed to properly weigh the evidence. The decision concludes that the "preponderance of evidence indicates that the claimant is able to care for her children independently." (Tr. at 18.) As support, the ALJ cites three consultative examinations. (*Id.*) In the first, Plaintiff said her mother helped only while Plaintiff attended GED classes. (Tr. at 18, 301.) The ALJ surmises that Plaintiff's failure to mention her family's assistance in one of the other examinations—aside from noting her sister's help cooking and cleaning—indicates that Plaintiff raised her children without help. (Tr. at 18.) Elsewhere, the ALJ mentioned Plaintiff's statements that she could cook and care for her children. (Tr. at 15.) On one occasion, Plaintiff claimed that she received no assistance. (Tr. at 16, 573, 592.)

Again, however, the evidence is more mixed than the ALJ suggested and requires a more thorough analysis. One significant oversight was the ALJ's failure to recognize that Plaintiff lived with her family throughout most of the period.[6] (Tr. at 51, 301.) *Cf. Dragon*, 470

---

[6] At the hearing in 2012, she testified that they moved from her mother's two years prior. (Tr. at 51.) The few references to her housing prior to 2010 either confirm that she lived at home or do not indicate where she lived. (Tr. at 301, 399.)

45

F. App'x at 463 (noting that while the claimant cared for her children, another parental figure lived in the same household). After having her first child, Plaintiff was able to return to school because, the records indicate, her mother "helps a lot with the baby especially when [Plaintiff] is in school." (Tr. at 433.) Moreover, the child's father also assisted during that period. (Tr. at 438.) On her application form and at the hearing, she claimed that others helped her raise the children. (Tr. at 40-45, 160.) While her mother's supporting application form checked that no one assisted Plaintiff with her dependents, the mother tellingly said, "I have to see did she take her meds," and had to provide reminders on other personal needs. (Tr. at 173.)

Thus, the evidence points in both directions. The ALJ does not, of course, need to cite every piece of evidence in the record, *Kornecky*, 167 F. App'x at 507-08 (6th Cir. 2006), and the existence of substantial evidence supporting the opposite conclusion will not be enough to overturn the ALJ's findings if they too have substantial support. *McClanahan*, 474 F.3d at 833. Nonetheless, the failure to assess some of the evidence here is troubling because the ALJ's step-three analysis relied on Plaintiff's ability to independently care for her children as the exclusive evidence of adaptive functioning. Even if such evidence could properly support that determination, the factual grounds here are less sturdy than the ALJ's brief overview suggests.

Moreover, the objective and opinion evidence generally supports the argument that Plaintiff suffers adaptive functioning deficits and should be reassessed on remand. Discussing Dr. Zaroff's 2005 examination, the ALJ highlighted Plaintiff's statements that she had no functional deficits, could handle everyday mathematics, and could cook. (Tr. at 18.) Regarding Dr. Fowler's examination, the ALJ found it supported the conclusion that Plaintiff could perform work because it opined that Plaintiff could "understand and follow only the simplest

46

of directions." (Tr. at 19.) The ALJ also relied on a reviewing psychologist who determined that Plaintiff could perform two-step tasks. (Tr. at 20.) The ALJ thought this was consistent with Plaintiff's ability to shop, drive, perform household chores, and care for children. (*Id.*)

The ALJ gave little weight to Dr. Austin's examination because he considered the invalid 2005 IQ scores and, in other examinations, Plaintiff's performance on the mental status examination was "noticeably" better. (Tr. at 21.) Additionally, the ALJ considered Plaintiff's ability in the 2005 examination to "perform serial three calculations with one mistake," and to perform serial three and serial seven calculations "slowly" and incompletely at the 2010 examination. (Tr. at 14.) The ALJ later concluded that these results indicated a somewhat greater mathematical ability than the results obtained in Dr. Austin's examination, where Plaintiff "was unable to perform [serial] seven calculations and she had poor performance on serial three calculations." (Tr. at 19.)

The ALJ's discussion is somewhat selective and leaves out important conclusions that were generally consistent among the sources. First, various doctors diagnosed "Mild Mental Retardation." (Tr. at 305, 469, 561.) Dr. Zaroff was the first, in 2005, to make this assessment; Dr. Fowler and Dr. Austin both retained it, even though the former questioned her effort. Additionally, the ALJ's observation that Plaintiff told Dr. Zaroff she could handle money (Tr. at 18, 300) is undercut by the conclusion of all three examiners that she could not manage benefit funds (Tr. at 305, 470, 561), as well as her mother's consistent statements, in both the application and as documented in Dr. Zaroff's notes, that Plaintiff struggled with finances. (Tr. at 174, 304.) The ALJ's reliance on Dr. Fowler's functional assessment, to the extent it influenced the step-three analysis, is also mistaken. His determination that Plaintiff could

47

follow only the "simplest of directions" and not "make independent work-related decisions" is not inconsistent with adaptive functioning deficits. *See Brown*, 948 F.2d at 270; *Grenham*, 2009 WL 1209026, at \*5.

Instead of considering these overarching diagnoses and conclusions, the ALJ tended to parse through those portions of the test results that the doctors left unexplained, such as the mathematical and general knowledge portions. For example, the ALJ concluded that Dr. Austin's opinion was less persuasive because Plaintiff had demonstrated in the 2005 examination with Dr. Zaroff a "good fund of information, and she demonstrated the ability to think abstractly and exercise judgment." (Tr. at 21.) Yet Dr. Zaroff never made either comment; instead, it appears the ALJ derived these insights from examining Plaintiff's recorded answers to Dr. Zaroff's questions. In particular, Plaintiff knew five large cities, named three celebrities and the current president, and cited "shootings" as a current event. (Tr. at 303.) In the abstract thinking section, she knew the meaning of half the proverbs she was asked to interpret—"Don't cry over spilled milk," but not "The grass is greener on the other side." (*Id.*) Contrary to the ALJ, Plaintiff's performance on these tasks during Dr. Austin's examination was not appreciably different: She answered both abstract thinking questions, though with uninspired responses, and named the current president. (Tr. at 560.)

The ALJ also emphasized the calculation portions of the testing. (Tr. at 14.) The results demonstrate more significant problems with adaptive functioning than the ALJ found. In her examination with Dr. Zaroff, she struggled to count backwards from thirty-one by threes, missing three out of ten questions. (Tr. at 303.) She also missed half of the multiplication questions—though there were only two—and there were no division problems. (*Id.*) Her

48

answers to nearly every calculation question posed by Dr. Austin were incorrect, which certainly raises credibility issues. (Tr. at 560.) Nonetheless, her prior tests, along with her documented struggles in school in this subject, provide evidence of real problems with adaptive functioning that the ALJ did not sufficiently address.

Thus, I suggest that substantial evidence fails to support the ALJ's conclusion that Plaintiff does not meet listing 12.05(C). The lone evidence cited—her ability to live independently and raise children—is not factually incontrovertible, but even more importantly, it is not enough of a basis to establish adequate adaptive functioning. The ALJ should have more thoroughly addressed the various components comprising adaptive functioning, which would require a closer examination of the school records. Moreover, the opinion evidence includes information relevant to Plaintiff's adaptive functioning that the ALJ should examine on remand. Also necessary is a more explicit discussion of the validity of the various IQ tests.

It is possible that a fuller analysis will show that the ALJ reached the correct decision. Evidence in the record cuts both ways. But for the Court to sufficiently review the decision, the ALJ must first construct the proper analysis, based on an in depth look at the school records and application of the proper framework for adaptive functioning. I do not find the evidence so compelling that remand for an immediate award of benefits is appropriate. *Cf. Dragon*, 470 F. App'x at 468 (Boggs, J., dissenting in part) (recommending remand in light of the principles set out by majority). The ALJ raised valid if overblown concerns with Plaintiff's credibility and the school records were largely unexamined. Thus a fresh analysis could come to the same result.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is not within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is not supported by substantial evidence. Consequently, I recommend that the case be remanded to the Commissioner for further proceedings under sentence four of 42 U.S.C. § 405(g).

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 21, 2015                              S/ PATRICIA T. MORRIS
                                                 Patricia T. Morris
                                                 United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 21, 2015                               By s/Kristen Krawczyk
                                                 Case Manager to Magistrate Judge Morris

51